UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| VENTRESE GRIFFIN-CURRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:12 CV 1401 JAR / DDN |
| ) | |
| CAROLYN W. COLVIN, [1] ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Ventrese Griffin-Curry for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge is reversed and remanded.

## I. BACKGROUND

Plaintiff Ventrese Griffin-Curry, born on September 9, 1961, filed applications for Title II and Title XVI benefits on March 30, 2009. (Tr. 129-36.) She alleged an onset date of disability of February 28, 2008, due to carpel tunnel, arthritis, hand numbness, and depression. (Tr. 179-86.) Plaintiff's applications were denied initially on May 15, 2009, and she requested a hearing before an ALJ. (Tr. 62-68.)

On August 26, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 10-20.) On June 21, 2012 the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

## II.  MEDICAL HISTORY

On March 26, 1973, a psychological examiner evaluated plaintiff at age eleven and recommended her assignment into a class for the educable mentally retarded.  She had a verbal IQ of 74, performance IQ of 64, and full scale IQ of 66.  On September 30, 1976, she had a verbal IQ of 60, performance IQ of 51, and full scale IQ of 57.  On June 6, 1977, she had a verbal IQ of 64, performance IQ of 70, and full scale IQ of 64.  After the last two IQ evaluations, psychological examiners recommended that she remain in the slow learner program.  On June 28, 1979, her teacher noted that plaintiff struggled with punctuality and attendance and that she became pregnant during the previous school year. (Tr. 216-31.)

On May 25, 2006, plaintiff complained of pain and tingling in her hands and feet.  Alan Pestronk, M.D., reviewed plaintiff's medical history and examined her.  Plaintiff initially received a breast cancer diagnosis in August 2005.  She underwent a mastectomy on the left breast with lymph node dissection and received chemotherapy.  Her last chemotherapy session occurred on December 29, 2005.  Tingling began in her hands in October or November 2005 and progressed after her last chemotherapy session.  She suffers constant pain and tingling in her hands.  She also received a carpal tunnel syndrome diagnosis five years earlier.  She complained of finger numbness that caused her to drop things and prevented her from sensing when her fingers bled or suffered injury.  Her feet also tingled but mildly in comparison to her hand tingling and pain.

Dr. Pestronk found diminished light touch sensation and no pin prick sensation on the fingertips of both hands, trace reflexes in her upper extremities, and no reflexes in her ankles and knees.  He planned to run several tests to identify the cause of these symptoms. (Tr. 480-82.)

On May 30, 2006, plaintiff underwent an electromyography study.[2]  The study indicated that plaintiff's lower extremities were normal but revealed evidence of severe carpal tunnel syndrome in both wrists.  (Tr. 483-86.)

On July 28, 2006, plaintiff met with Susan E. Mackinnon, M.D.  Dr. Mackinnon noted that chemotherapy received in 2005 exacerbated the hand numbing and tingling, which first appeared three years earlier.  Plaintiff complained of triggering in her right ring

---

[2] Electromyography is the recording of electrical activity generated in muscle for diagnostic purposes.  Stedman's Medical Dictionary, 622 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

finger.[3] She found that plaintiff required nerve releases on both wrists at the first annular pulley and the ulnar nerve.[4] (Tr. 516.)

On August 15, 2006, Dr. Mackinnon released the right carpal tunnel, triggering of the right ring finger, and the ulnar nerve. She found significant compression at all levels and marked compression of the deep motor branch of the ulnar nerve. (Tr. 515.)

On August 17, 2006, plaintiff reported pain relief in her right hand. She further requested the surgical release of her left carpal tunnel and left ulnar nerve. Dr. Mackinnon recommended physical therapy for plaintiff's right hand and scheduled surgery for her left hand. (Tr. 514.)

On August 30, 2006, plaintiff continued to complain about both her hands and renewed her request for left hand surgery. Dr. Mackinnon removed plaintiff's sutures and informed plaintiff that she would refrain from left hand surgery until plaintiff's right hand improved. (Tr. 512.)

On September 8, 2006, plaintiff complained of pain and swelling in her right wrist. Christine Ellis, RN, prescribed Clindamycin.[5] (Tr. 511.)

On September 20, 2006, plaintiff complained of right hand pain that she rated as 10 of 10 and that caused her to visit the emergency room on September 15. Dr. Mackinnon stated that she would not recommend left hand surgery due to the response to the right hand surgery. Dr. Mackinnon found no infection and reasonable range of movement and recommended pain management. (Tr. 510.)

On September 26, 2006, Anthony Eidelman, M.D., evaluated plaintiff at the Barnes-Jewish Hospital Washington University Pain Management Center. Plaintiff complained primarily of burning pain in her upper and lower extremities. Dr. Eidelman noted that cervical spine MRIs revealed no pathology or tumor metastasis and that plaintiff found that

---

[3] Triggering is a condition evidenced by a finger or thumb either locked in a bent position or only able to straighten with a snap. Mayo Clinic, http://www.mayoclinic.com/health/trigger-finger/DS00155 (last visited March 26, 2013). Triggering may be treated with finger splints or by release with a needle. Mayo Clinic, http://www.mayoclinic.com/health/trigger-finger/DS00155/DSECTION=treatments-and-drugs (last visited March 26, 2013).

[4] An annular pulley is ring-shaped part of the fibrous digital sheath of the hand or foot. Stedman at 1601.

[5] Clindamycin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited March 26, 2013).

Gabapentin effectively reduced her pain.  Dr. Eidelman's impressions were chemotherapy-induced peripheral neuropathy, upper and lower extremity polyneuropathy, carpal tunnel syndrome in both wrists, breast cancer status post chemotherapy, and insomnia.[6]  He prescribed Topamax and Nortriptyline.[7]  (Tr. 488-89.)

On October 6, 2006, plaintiff saw Cynthia Ma, M.D.  A mammogram taken in July 2006 revealed no evidence of cancer.  Dr. Ma noted that plaintiff continued to suffer numbness and tingling in her hands.  (Tr. 502-03.)

On January 26, 2007, plaintiff complained of intermittent pain in the low back and right thigh triggered by excessive walking and continued hand tingling and numbness.  Dr. Ma found no evidence of cancer and opined that arthritis caused her back pain.  (Tr. 500-01.)

On March 6, 2007, plaintiff arrived at the emergency room, complaining of shortness of breath, anxiety, difficulty swallowing, and chest pain.  Sineff S. Sanford, M.D., diagnosed musculoskeletal chest pain and a sprained rotator cuff.  (Tr. 442-59.)

On May 21, 2007, plaintiff complained of increased numbness and tingling in her right hand fingertips.  Dr. Ma found no evidence of recurring cancer.  She diagnosed chemotherapy-induced amenorrhea and recommended vitamin D and calcium supplements.  (Tr. 497-98.)

On June 28, 2007, plaintiff received a left shoulder X-ray, which revealed mild glenohumeral joint osteoarthritis.[8]  (Tr. 441.)

On August 20, 2007, plaintiff arrived at the emergency room, complaining of sharp chest pain that radiated to her back.  She stated that she had a similar episode four months ago and received a diagnosis of anxiety attack.  Brent E. Ruoff, M.D., diagnosed atypical chest pain but could not determine the cause.  (Tr. 421-40.)

On August 28, 2007, Dr. Mackinnon released plaintiff's left carpal tunnel and left ulnar nerve.  (Tr. 419-20.)

---

[6] Neuropathy is a term for any disorder affecting the nervous system.  Stedman at 1313.

[7] Topamax is used to prevent and control seizures and prevent migraine headaches.  WebMD, http://www.webmd.com/drugs (last visited March 26, 2013).  Nortriptyline is used to treat mental/mood problems such as depression.  Id.

[8] Glenohumeral refers to the shoulder joint.  Stedman at 811.

On September 5, 2007, plaintiff complained of left arm pain and that she could not make a fist with her left hand. Deannia Dunnegan, RN, prescribed Darvocet and recommended that plaintiff continue hand exercises.[9] (Tr. 509.)

On September 6, 2007, plaintiff arrived at the emergency room, complaining of hand pain and that her stitches were infected. Amanda M. Wood, M.D., diagnosed post-operative pain and swelling. (Tr. 411-18.)

On September 10, 2007, Dr. Mackinnon observed severe triggering in plaintiff's thumbs. She provided plaintiff with thumb splints and scheduled right thumb trigger release surgery. (Tr. 507.)

On September 20, 2007, plaintiff arrived at the emergency room, complaining of stabbing low back pain, which she rated as 10 of 10. Gregory M. Polites, M.D., diagnosed low back pain. (Tr. 392-410.)

On October 15, 2007, plaintiff arrived at the emergency room, complaining of wrist pain that radiated up to her neck. However, she left before meeting with a physician. (Tr. 387-91.)

On October 16, 2007, plaintiff returned to the emergency room, complaining of left hand pain that radiated up her arm and neck. Rosanne S. Naunheim, M.D., diagnosed arthritis and degenerative joint disease. (Tr. 364-86.)

On October 17, 2007, plaintiff received a mammogram of her right breast, which revealed no evidence of malignancy. (Tr. 363.)

On October 29, 2007, Dr. Mackinnon and plaintiff discussed the trigger release surgery. Dr. Mackinnon advised plaintiff to discontinue ibuprofen for her surgery and noted that plaintiff continued to wear splints. (Tr. 506.)

On November 21, 2007, Dr. Mackinnon assessed plaintiff for her disability claim. She noted that plaintiff complained of severe hand pain and that she was scheduled for trigger release surgery. She further stated that the triggering and pain caused difficulty with hand use and lifting and that use of her hands for any reason should be prohibited. (Tr. 505.)

On November 26, 2007, plaintiff arrived at the emergency room, complaining of a headache that began two days earlier and back pain that began that morning. Mark D. Levine, M.D., diagnosed plaintiff with a headache and low back pain. (Tr. 346-62.)

---

[9] Darvocet is used to alleviate pain. WebMD, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (last visited March 26, 2013).

On December 4, 2007, Dr. Mackinnon performed a release on the first annular pulley of plaintiff's right thumb. (Tr. 344-45.)

On February 29, 2008, plaintiff went to the Barnes Jewish Hospital clinic to arrange an echocardiogram to diagnose her shortness of breath.[10] Plaintiff stated that she could climb three flights of stairs before experiencing shortness of breath. Thai Ho, M.D., ordered an echocardiogram. (Tr. 266-69.)

On March 28, 2008, Dr. Ho ordered a pulmonary function test, chest X-rays, and a treadmill stress test. (Tr. 264.)

On September 4, 2008, plaintiff received a right shoulder X-ray, which revealed mild acromioclavicular osteoarthritis.[11] (Tr. 339.)

On October 9, 2008, plaintiff arrived at the emergency room, complaining of low back pain that radiated down her right leg and foot. Sean C. Fitzmaurice, M.D., diagnosed sciatica.[12] (Tr. 322-38.)

On October 30, 2008, plaintiff arrived at the emergency room, complaining of pain in her right hip that radiated down her leg. She reported hitting her thigh on a bed one week ago. Joseph M. Primrose, M.D., diagnosed sciatica. (Tr. 311-21.)

On November 14, 2008, plaintiff arrived at the emergency room, complaining of swollen toes and pain in her left knee and foot that began that morning. Lawrence M Lewis, M.D., diagnosed low leg pain. (Tr. 302-10.)

On December 30, 2008, plaintiff complained of pain in her left arm and hand. She further complained that her pain medications Tramadol, Gabapentin, and ibuprofen did not completely remove her pain and requested Percocet. Sahar Masoudi, M.D., prescribed Percocet and instructed that plaintiff take it for breakthrough pain as necessary. (Tr. 257-58.)

On January 20, 2009, plaintiff arrived at the emergency room, complaining of stabbing pain in the left wrist that radiated up the left arm. Ellen K. Christ, PA, diagnosed a ganglion cyst.[13] (Tr. 288-301.)

---

[10] Echocardiograms use ultrasound to investigate the heart and major vessels and diagnose cardiovascular lesions. Stedman at 608.

[11] Acromioclavicular refers to a joint in the shoulders. Stedman at 19.

[12] Sciatica is pain in the lower back and hip that radiates down the back of the thigh into the leg. Stedman at 1731.

On February 20, 2009, plaintiff arrived at the emergency room, complaining of pain in the middle finger of her left hand that began when she slammed the finger in a screen door three days earlier. She stated that her finger was infected. Elizabeth Hilliker, M.D., diagnosed a fracture. (Tr. 277-87.)

On April 9, 2009, plaintiff complained of a new cyst on her left hand and scheduled an appointment with a surgeon. (Tr. 242-44.)

On April 14, 2009, plaintiff complained of persistent pain caused by cysts on her hand. Dr. Ho noted that plaintiff used two Percocet pills per day. He also noted that although a dobutamine stress test was recommended to diagnose her shortness of breath, plaintiff declined.[14] (Tr. 239-40.)

On April 27, 2009, plaintiff complained that her Percocet did not fully relieve her pain and had decreased in effectiveness. She requested an increase in her prescription. Rupal Shroff, M.D., noted that plaintiff met with a surgeon regarding her hand and received a physical therapy referral but scheduled no surgery. (Tr. 672-73.)

On May 14, 2009, Kyle DeVore, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. He found that she suffered from depression but that it was not severe. He further found that she suffered no restriction of daily living activities, difficulties in maintaining social functioning, concentration, persistence, or pace, or repeated episodes of decompensation. He stated that her alleged functional limitations were partially credible at most and not attributable to her depression. He also stated that medication controlled her depression. (Tr. 460-70.)

On May 15, 2009, Geraldine Boeger submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. She found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours, and suffered no limitations for pushing and pulling. She also found that plaintiff should avoid all exposure to extreme cold due to her decreased sense of feeling, which could cause hypothermia or frost bite. (Tr. 471-77.)

---

[13] Ganglion cysts contain mucopolysaccharide-rich fluid within fibrous tissue or occasionally, muscle bone or semilunar cartilage. Stedman at 785.

[14] Dobutamine stress echocardiogram uses a drug rather than exercise to evaluate heart and valve function. WebMD, http://www.webmd.com/heart-disease/guide/diagnosing-echocardiogram (last visited March 26, 2013).

On June 16, 2009, Dr. Ho noted that plaintiff continued to complain of pain caused by the hand fracture, although she could flex and extend her hand without difficulty. (Tr. 656-57.)

On June 22, 2009, plaintiff arrived at the emergency room, complaining of pain in the neck, low back, right leg, left hand, elbow, and arm. (Tr. 634-52.)

On June 25, 2009, a sonograph revealed two small ganglion cysts on plaintiff's left wrist. (Tr. 625.)

On July 16, 2009, X-rays of the left wrist revealed moderate left triscaphe and thumb carpometacarpal joint osteoarthritis and mild left distal radioulnar joint osteoarthritis. (Tr. 616.)

On November 18, 2009, plaintiff arrived at the emergency room, complaining of severe chest pain and shortness of breath. The pain began suddenly the previous day, and breathing increased its severity. She also complained of central epigastric pain.[15] She stated that she had difficulty swallowing and inability to eat or drink and that she had never previously experienced such pain. Brent E. Ruoff, M.D., diagnosed dyspnea.[16] (Tr. 532-82.)

On November 20, 2009, plaintiff reported that she did not suffer chest pain. Angela Hirbe, M.D., opined that anxiety regarding child care induced the chest pain and noted that plaintiff's daughter would care for her grandchildren, except for weekends. Dr. Hirbe also noted tapering narcotic medication as a goal. (Tr. 527-31.)

On February 12, 2010, plaintiff complained of knee pain. X-rays revealed mild patellofemoral osteoarthritis in both knees. She also argued with Dr. Hirbe about her need for pain medication, but Dr. Hirbe continued to decrease the prescribed amount of Percocet as previously planned. Dr. Hirbe also referred plaintiff to physical therapy. (Tr. 745-47, 753.)

On March 22, 2010, Dr. Hirbe noted that although plaintiff continued to complain about knee pain, plaintiff maintained a normal gait at a brisk pace. Dr. Hirbe continued to decrease the prescribed amount of Percocet. (Tr. 740-41.)

On April 13, 2010, plaintiff complained of left knee pain that increased in severity the previous week. She further complained that extending her knee caused her difficulty. Plaintiff rated the pain 10 of 10 and stated that it radiated to the thigh and worsened when

---

[15] Epigastric refers to the abdominal area. Stedman at 1666.

[16] Dyspnea is shortness of breath. Stedman at 601.

she walked. She also stated that Percocet no longer alleviated her pain and that the pain prevented her from sleeping. Dr. Hirbe noted that plaintiff attended physical therapy, received instructions for exercise, but had not performed them. She referred plaintiff for a left knee MRI. (Tr. 734-39.)

On April 21, 2010, plaintiff received a left knee MRI. Jason Kayser, M.D., found Grade III-IV chrondosis in the lateral patellar facet with underlying subchondral bone marrow edema, horizontal oblique tear of the posterior horn of the medial meniscus extending to the inferior articular surface, moderate to large joint effusion, a small popliteal cyst, and a small intra-articular body in the suprapatellar bursa.[17] (Tr. 697.)

On April 25, 2010, plaintiff arrived at the emergency room, complaining of left knee pain and swelling. Plaintiff stated that extending her knee caused a popping sound. Ben M. Gasirowski, M.D., diagnosed derangement of the left knee, osteoarthritis, and degenerative joint disease. (Tr. 716-31.)

On April 28, 2010, Dr. Jennifer Shroff, M.D., referred plaintiff for an orthopedic evaluation. On May 20, 2010, Dr. Hirbe noted that plaintiff scheduled an orthopedic evaluation on June 9. (Tr. 709-15.)

**Testimony at the Hearing**

The ALJ conducted a hearing on August 19, 2010. (Tr. 24-55.) Plaintiff testified to the following. Plaintiff last worked in home health care in 2005, when she suffered from cancer. Her supervisor temporarily dismissed her due to her treatment schedule, although she worked for some time while receiving chemotherapy. (Tr. 29, 42-43.)

She is currently unable to work because of her severe case of carpal tunnel syndrome and arthritis that deprives her of the use of her hands. She underwent carpal tunnel surgery on three occasions and trigger finger surgery on her left thumb. She plans to undergo surgery on her right thumb but her physician advised waiting until issues with her knee are resolved. (Tr. 29-31.)

Her hand problems began in March 2006, signified by dropping things and severe pain. She later received a diagnosis for carpal tunnel syndrome. Surgery did not improve the condition. She received chemotherapy in 2005, which caused her hand problems. She

---

[17] Chrondosis is the softening or loss of smooth cartilage, most frequently that which covers the back of the kneecap. WebMD, http://www.webmd.com/hw-popup/chondrosis (last visited March 26, 2013). Effusion is the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. Stedman at 616.

last consulted a physician, Dr. Mackinnon, regarding her hands in early 2010. Plaintiff informed Dr. Mackinnon that without medication, the hand pain would force her to the emergency room. Dr. Mackinnon found pain medication preferable to surgery. Plaintiff takes Gabapentin and Percocet for her hand pain. She continues to drop things constantly. She avoids cooking or lifting. She last cooked three months ago and dropped food on the floor. (Tr. 31-33.)

Physicians found torn ligaments and fluid in her left knee earlier that day. Her left knee problems began on March 24, 2010. Percocet also addresses her knee condition. Her physical therapists informed her that due to her difficulty with bending, she must consult a physician before resuming physical therapy. Her physician informed her that she requires arthroscopic knee surgery. Her knee is swollen, she cannot bend it, and it makes a popping sound. Her physician recommended that she wear a knee brace, which she wore at the hearing. Although she had no problems standing before she hurt her knee, she can currently stand and walk for only two or three minutes. Her husband drove her to the hearing. She walked at least 100 feet to attend the hearing. She can sit for only twenty minutes before the knee pain requires her to stand or her knee locks. (Tr. 33-36.)

Her children are grown and live on their own. She lives with her husband, who receives social security benefits due to disability. He has heart and kidney problems and high blood pressure. He performs most of the household chores, including vacuuming, mopping, washing, and cooking, although she dusts and washes dishes. Her husband washes the laundry because it requires climbing stairs. They shop for groceries together once per week. She attends church every Sunday. Her four grandchildren visit every day to play and swim and are currently living with her and her husband due to a house fire two weeks ago. (Tr. 36-39.)

She previously enjoyed taking walks with her husband in the park. She last spent a night outside her home two weeks ago to visit her sister in Winfield, Missouri. Her knees cause her difficulty with climbing stairs, and sometimes she must wait until her knee stops popping before she returns upstairs. Before her knee injury, she could wash laundry, walk, and clean. (Tr. 39-41.)

She completed tenth grade and attended special school from sixth to eighth grade. She continues to struggle with reading and writing, but she can read and write a simple grocery list. Her husband assists her with reading some mail. She never took a driver's license test because she would not understand it. Her husband completed her social

security application and related documents, which she could not have done herself. (Tr. 41-42.)

She also suffers from a pinched hand nerve, which causes weakness. She must use both hands to lift a gallon of milk to pour it. She could not lift a pot of boiling water with one hand due to her fear of falling or dropping it. She cannot peel more than two potatoes before her fingers cramp. She never types, and although she has a computer at home, she does not know how to operate it. (Tr. 43-44.)

She currently receives most of her treatment at Wohl's Clinic. She goes every month for her Percocet prescription and sometimes meets with her physician. She has taken narcotics daily since 2005. (Tr. 44-45.)

Vocational expert (VE) Melissa Benjamin also testified at the hearing. The VE testified that plaintiff had no previous work history. The ALJ presented a hypothetical question concerning a young individual with an eleventh grade education with special education courses, and no previous work history. The individual would be limited to light work, could lift up to twenty pounds occasionally, lift or carry up to ten pounds frequently, stand or walk approximately six hours in an eight-hour workday. The individual could only occasionally push or pull with either arm, only occasionally kneel, or climb ramps or stairs, and could not climb ladders, ropes, or scaffolds. The individual would need to avoid complex written or verbal communication and exposure to extremely cold temperatures. The individual would be further limited to only frequent handling of objects with both arms and to simple, routine, repetitive tasks. (Tr. 46.)

The VE responded that such individual could perform work as a laundry sorter with about 300,000 positions nationally, cleaner with about 200,000 positions nationally, or greeter with about 100,000 positions nationally. The ALJ altered the hypothetical individual by limiting the individual to only occasional handling of objects. The VE responded that such individual could perform work only as a greeter. (Tr. 47.)

The ALJ again altered the hypothetical individual by limiting to the individual to frequent handling with the right hand and occasional handling with the left hand. The VE responded that such individual could perform as a greeter, an usher with about 80,000 positions nationally, and an information clerk with about 90,000 positions nationally. (Tr. 47-48.)

The ALJ altered the individual by limiting the individual to sedentary work, including lifting ten pounds only occasionally, standing or walking for only about two hours per day, and sit for only six hours. The VE responded that such individual could perform

work as an information clerk, inspector with about 85,000 positions nationally, and telephone information clerk with about 60,000 positions. If either of the two immediately aforementioned hypothetical individuals needed to sit or alternate positions at will, the available positions would be reduced by half. (Tr. 48-49.)

The ALJ altered the individual with the need to sit for seven hours per day. The VE replied that the available positions would be further reduced by ten percent. The ALJ altered the individual by limiting the individual to no handling with the left hand and occasional handling with the right hand. The VE replied that the individual could perform no work. (Tr. 50-51.)

### III. DECISION OF THE ALJ

On August 26, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-20.) At Step One of the prescribed regulatory decision-making scheme,[18] the ALJ found that plaintiff had not engaged in substantial gainful activity since March 30, 2009, the application date. At Step Two, the ALJ found that plaintiff's severe impairments were borderline intellectual functioning, bilateral carpal tunnel syndrome, left knee pain, and status post breast cancer in remission. (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 13.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except her need for a sit/stand option, she can only occasionally push or pulling using either arm, and crouch, kneel, crawl, or climb ramps or stairs, and can never climb ladders. Further, she can only frequently handle objects with her right hand and only occasionally handle objects with her left hand, must avoid exposure to extreme cold, is limited to work that does not require complex written or verbal communication, and requires simple, routine, repetitive tasks. At Step Four, the ALJ found that plaintiff had no past relevant work. (Tr. 15-19.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 19.)

Additionally, plaintiff requested the reopening of a prior social security application filed on March 21, 2006, alleging that she had new and material evidence. However, the

---

[18] See below for explanation.

ALJ denied plaintiff's requests, reasoning that plaintiff showed no good cause for failing to submit the evidence at an earlier date. (Tr. 10.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by failing to reopen her social security application filed on March 21, 2006. Specifically plaintiff argues that the IQ scores were "new and material evidence" under 20 C.F.R. § 416.1489(a)(1). However, an ALJ may refuse to reopen a prior social security application if a claimant has not shown good cause for the failure to incorporate evidence into the record in a prior proceeding. Hinchey v. Shalala, 29 F.3d 428, 433 (8th Cir. 1994); Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993). The ALJ stated as a reason for declining to reopen the application the failure to show good cause for failing to introduce the IQ scores when the application was open. (Tr. 10.) Accordingly, the ALJ did not err by not reopening the March 21, 2006 social security application.

Plaintiff argues that the ALJ erred by finding that plaintiff did not suffer from a disability that meets or equals Listing 12.05C. Listing 12.05C addresses mental retardation and states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function

20 C.F.R. § 404, Subpt. P, App. 1.

Plaintiff argues that the ALJ improperly determined that plaintiff did not suffer deficits in adaptive functioning. Adaptive skill areas include "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Atkins v. Virginia, 536 U.S. 304, 309 n.3 (2002). The ALJ made his determination on the basis of plaintiff's demeanor at the hearing and her testimony that she managed her household prior to her knee injury and had custody of her five grandchildren. (Tr. 13.) He further based his determination on the lack of testimony suggesting mental retardation, the lack of a mental retardation diagnosis, and Dr. DeVore's assessment that plaintiff suffered no severe mental impairments. (Tr. 13.)

However, the ALJ fails to reconcile his determination that plaintiff suffers from no adaptive skill deficits with his subsequent finding that she is unable to read complex writing and that she attended special education classes. (Tr. 14-15.) The ALJ's determination that she had no adaptive functioning deficits impliedly includes a finding that she had no deficits in functional academic skills. However, this contradicts his finding regarding her education and reading abilities. Further, contrary to the ALJ's statements that no testimony suggested mental retardation, plaintiff testified that she had never taken a driving test, could not understand her mail, and could not complete the social security application forms without assistance due to her limited ability to read and write. (Tr. 42.) Additionally, no evidence contradicts plaintiff's allegations regarding her reading and writing ability. Finally, the record indicates that the onset of the reading and writing impairments occurred before the age of 22. (Tr. 216-31.)

Plaintiff further argues that the ALJ improperly found that her IQ scores submitted for Listing 12.05C were invalid. Plaintiff submitted evidence of three IQ evaluations taken between 1973 and 1977 indicating verbal IQs of 60, 64, and 74, performance IQs of 51, 64, and 70 and full scale IQs of 57, 64, and 66. (Tr. 220-23.) The Commissioner argues that although the ALJ did not discuss his reasons for finding the IQ scores not valid, substantial evidence supports their invalidation, including plaintiff's daily living activities and her failure to show qualifications of the IQ evaluator.

Regarding the Listing 12.05C, the ALJ stated, "In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70." (Tr. 14.) The Commissioner apparently interpreted this statement to mean that the ALJ found that the IQ scores were not competent evidence or were contradictory to other evidence. The Commissioner misconstrues the ALJ's decision. In the paragraph addressing Listing 12.05B, the ALJ makes a similar statement. (Tr. 14.) However, rather than discussing the credibility of the IQ scores, the ALJ explains that the IQ scores were not sufficiently low enough for plaintiff to qualify under that listing. Similarly, in the paragraph addressing Listing 12.05C, to support his aforementioned statement, the ALJ merely states, "As noted above, the claimant's most recent IQ test taken when she was 15 years old, scored between 64 and 70." In both instances, context indicates that the ALJ found that the IQ scores were insufficiently low rather than not credible. (Tr. 14.) The ALJ uses the word "valid", but this merely tracks the language of the pertinent regulation. See 20 C.F.R. § 404, Subpt. P, App. 1. The simple misreading of the relevant numbers more reasonably explains the ALJ's

decision than an entirely omitted credibility determination with only an ambiguous word indicating that the ALJ considered credibility a material concern.

Furthermore, the standard for determining whether an impairment is severe is the same as the standard for determining whether the "additional and significant work-related limitation of function" requirement of Listing 12.05C is satisfied. See Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006). The ALJ found that plaintiff had several severe impairments in addition to her mental condition. (Tr. 10.)

In sum, substantial evidence does not support the ALJ's determination that plaintiff does not meet the requirements of Listing 12.05C. Rather, the record indicates that plaintiff satisfies the requirements, and nothing therein controverts the evidence of her IQ scores and deficits in academic functioning. (Tr. 42, 216-31.) In light of the unequivocal record regarding Listing 12.05C, the action should be remanded to the Commissioner for an award of benefits. Pate-Fires v. Astrue, 564 F.3d at 947.

## VI. RECOMMENDATION

For the reasons set forth above, the undersigned recommends that the decision of the Commissioner of Social Security be reversed and remanded for further proceedings under Sentence 4 of 42 U.S.C. § 405(g) for an award of benefits based upon a period of disability beginning February 28, 2008.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 9, 2013.